### In re CONSOLIDATED LAND DISPOSAL REGULATION LITIGATION,

**National Solid Wastes Management Association, et al., Intervenors.**

**Nos. 82–2210, 82–2211, 82–2216, 82–2259, 82–2274 and 82–2275.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1991.

Decided July 16, 1991.

William R. Weissman, with whom Norman L. Rave, Jr., for Edison Electric Institute, et al., Karl S. Bourdeau and Barton C. Green, for American Iron and Steel Institute were on the joint brief, for petitioners in Nos. 82–2210 and 82–2211 and intervenors in Nos. 82–2216, 82–2259, 82–2274

and 82–2275. Sue M. Briggum also entered an appearance, for petitioners.

Anthony F. King, with whom Christopher H. Marraro, G. William Frick and Ralph J. Colleli, Jr. were on the brief, for petitioner, American Petroleum Institute in Nos. 82–2216 and 82–2274. James K. Jackson and Bruce A. Eisen also entered appearances, for petitioner.

David J. Kaplan, Atty., Dt. of Justice and Caroline H. Wehling, Attorney, E.P.A., with whom Barry M. Hartman, Deputy Asst. Atty. Gen. was on the brief, for respondents in Nos. 82–2210, 82–2211, 82–2216, 82–2259, 82–2274 and 82–2275. Lee R. Tyner and Barry M. Hartman, Attys., Dept. of Justice, also entered appearances, for respondents.

Richard A. Flye and Robert L. Rhodes, Jr. entered appearances, for petitioner, Mobil Oil Chemical Co. in No. 82–2275.

William C. Brashares and Charles A. Samuels entered appearances, for intervenor, National Solid Wastes Management Ass'n in Nos. 82–2210, 82–2211, 82–2216, 82–2259 and 82–2274.

William L. Rosbe and Scott E. Slaughter entered appearances for intervenor, Ford Motor Co. in Nos. 82–2210, 82–2211, 82–2216, 82–2259, 82–2274 and 82–2275.

Karen L. Florini entered an appearance, for intervenor, Environmental Defense Fund in Nos. 82–2210, 82–2211, 82–2216, 82–2259, 82–2274 and 82–2275.

John T. Smith, II entered an appearance, for intervenor, Chemical Mfrs. Ass'n in No. 82–2274.

Benjamin W. Boley and Michael S. Giannotto entered appearances, for intervenors, Atlantic Cement Co., Inc., et al., in No. 82–2274.

Richard S. Waserstrom entered an appearance, for intervenors, American Paper Institute, et al., in No. 82–2274.

Louis E. Tosi and Julius J. Hallis entered appearances for intervenor, General Motors Corp. in No. 82–2275.

Before RUTH BADER GINSBURG, SILBERMAN, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

In late 1982, a score of petitioners and intervenors sought review of the interim final hazardous waste land disposal regulations that the Environmental Protection Agency had issued in July of that year. Briefing was deferred while the parties pursued first legislative changes and then settlement talks. Now, after many parties have withdrawn, many issues have been settled or overtaken by events, and several of the original counsel have been succeeded by others—indeed by a new generation at the bar—three petitioners set before us two of the original 84 issues.

Petitioners American Iron and Steel Institute and Edison Electric Institute challenge the regulations insofar as they require a closed land disposal facility to obtain and abide by the terms of an EPA permit. 40 C.F.R. § 270.1(c); *see* 47 Fed. Reg. 32,336 (July 26, 1982) (scope of permit requirement, then codified in 40 C.F.R. Part 122). These petitioners contend that the regulations are arbitrary and capricious and exceed the agency's statutory authority, and that the agency improperly issued a portion of the post-closure permit regulation without prior notice and an opportunity for the public to comment.

Petitioner American Petroleum Institute challenges the regulations insofar as they establish groundwater monitoring and cleanup standards applicable to any disposal site located above an aquifer, without making specific provision for the exemption of sites above aquifers that are both contaminated to the point of being useless and isolated from other waters. API contends that because the further contamination of such an aquifer poses no threat to human health or the environment, the regulation is arbitrary and capricious and in excess of the EPA's authority. For the reasons set out below, we deny both petitions for review.

## I. POST-CLOSURE PERMITS

■ The Resource Conservation and Recovery Act gave the EPA very broad authority to regulate the disposal of hazardous waste. Sections 3004 and 3005 respectively direct the agency to establish "performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal [TSD] of hazardous waste," 42 U.S.C. § 6924(a), and to issue regulations

requiring each person owning or operating an existing [TSD] facility . . . to have a permit issued pursuant to this section. [After the effective date of these regulations] the treatment, storage, or disposal of any such hazardous waste . . . is prohibited except in accordance with such a permit.

42 U.S.C. § 6925(a). Pursuant to § 3005, the EPA requires that all hazardous waste disposal facilities "that received wastes after July 26, 1982, or that certified closure (according to § 265.115) after January 26, 1983" obtain a post-closure permit. 42 C.F.R. § 270.1(c). The petitioners contend that this regulation is inconsistent with the "common sense meaning of [§ 3005] . . . that a permit is required and authorized only for facilities that currently are or will be treating, storing, or disposing of (i.e., 'managing') hazardous waste."

We approach this issue within the framework established in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because neither the petitioners nor the EPA claims that the Congress specifically addressed the question of requiring a post-closure permit for a disposal facility, we proceed under *Chevron* step two. Accordingly, we defer to the agency's interpretation of the statute so long as it is reasonable.

The EPA defines a "disposal" facility, for purposes of both § 3004 and § 3005, as any facility that received hazardous waste after the effective date of the permit requirement (November 19, 1980), regardless of whether the facility is currently open or closed. The petitioners concede that "a

disposal facility that receives hazardous waste … remains a 'disposal facility' subject to regulation [under § 3004] after it closes." They argue, however, that § 3005 is narrower in scope than § 3004; as they read § 3005, a permit is required only for on-going activities—the treatment, storage, or disposal of waste at such facilities—not for the facility itself post-closure.

The EPA maintains that it is reasonable to interpret broadly the term "disposal" in § 3005 in light of § 1004 of RCRA, which defines "disposal" very capaciously:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or be discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). A TSD facility "at which hazardous wastes have been disposed by placement in or on the land" remains subject to both permitting (per § 3005) and regulation (per § 3004), the agency contends, because "such hazardous wastes or constituents may continue 'leaking' or 'may enter the environment or be emitted … or discharged …' " into the environment.

The petitioners, on the other hand, make the linguistic point that "[d]isposal … is not a continuing activity but occurs anew each time waste is placed into or on land." That may be one way in which the word is used in ordinary language, but is not necessarily how it is used in the statute; the equation of "disposal" with "leaking," which is a continuous phenomenon rather than a discrete event, is enough to blunt the sting of the petitioners' point. Theirs is at most an alternative reading of the statute, not an argument as to why the EPA's reading of the statute is unreasonable.

As to reasonableness, we note that the EPA also interpreted "disposal" to encompass the continuing presence of waste when it read § 3004(a) to authorize post-closure performance standards, *see* 45 Fed. Reg. 33,198 (May 19, 1980). The petitioners concede that authority to the agency, yet insist that the word "disposal" must be read differently when it appears in § 3005. We are constrained to disagree: the two sections were intended to work together (as evidenced by the cross references in §§ 3004(a)(7) and 3005(c)(1)), and divergent interpretations would create a gap in an otherwise complete scheme. We therefore hold that the agency is within its authority in requiring a post-closure permit as the means to implement its substantive regulatory authority under § 3004.

We need not reach the merits of the petitioners' argument that the EPA provided inadequate notice of the portion of its proposal that requires post-closure permits for disposal facilities that had operated under interim status while their permit applications were pending, but that had closed prior to EPA approval of those applications. At oral argument the petitioners forthrightly acknowledged that a remand solely in order to reopen the record for further comment would provide them no meaningful relief: the EPA fully understands their objections. Thus, having failed to obtain an order requiring the agency to reconsider its legal position, the petitioners would gain nothing from an order requiring the EPA to reopen the rulemaking record.

## II.  MONITORING UNUSABLE AQUIFERS

■ Section 3004 authorizes the EPA to enact only such performance standards "as may be necessary to protect human health and the environment." 42 U.S.C. § 6924(a). Pursuant to this authority, the EPA requires that the operator of a disposal site (1) monitor the ground water in the uppermost aquifer below the site in order to detect leaks (detection monitoring); (2) in the event of a leak, conduct further monitoring in order to determine whether the leaked substance exceeds the permissible concentration level (compliance monitoring); and if it does, (3) take remedial action to clean up the contaminated ground water. *See* 40 C.F.R. §§ 264.98 to .100. The regulation requires detection monitoring with-

out exception, but provides for flexibility in the compliance monitoring and remedial stages. For example, the agency will exclude from the program a hazardous constituent "not capable of posing a substantial present or potential hazard to human health or the environment," taking into account a list of considerations bearing upon the quality, isolation, and likely use of the aquifer; and it will establish an alternate concentration level for a constituent that does not pose such a hazard below that concentration. 40 C.F.R. §§ 264.93, 264.-94(a) & (b).

The petitioner contends that the EPA acted arbitrarily and capriciously by failing categorically to exempt from detection monitoring any site above an aquifer that is both "completely cut off from other bodies of groundwater or surface water" and "so contaminated that [it] cannot be put to any meaningful use." The agency also exceeded its statutory authority, according to the petitioner, because further contamination of such an isolated and unusable aquifer poses no conceivable threat to "human health [or] the environment."

The EPA responded skeptically to this claim in its rule-making decision: "EPA believes that this would be an extremely rare situation, if indeed such a location exists, and has therefore, chosen not to establish an exemption at this time." 47 Fed.Reg. at 32,293. The agency also points out that the interim final regulation allows for adjustment in the response to a leak consistent with the quality of the aquifer, and that looking toward a final rule, it requested comments on the existence of such unusable aquifers as the petitioner posits. Absent evidence in the record before it, the agency declined the petitioner's invitation to fashion a special rule for a speculative circumstance.

The EPA cannot reasonably be required to create a blanket exemption for a hypothetical case unsupported by any evidence in the record, and the reality of which it doubts. Even in our leading case on the desirability of providing for the possibility of exemption from "general rules," *WAIT Radio v. FCC*, 418 F.2d 1153 (D.C.Cir.

1969), upon which the petitioner principally relies, we spoke only of requests for waivers "accompanied by supporting data." *Id.* at 1157. The agency has stated that it is open to just such a showing. It is now up to the petitioner to make a record that will support its claim that it is unreasonable for the agency not to provide for the exemption of unusable aquifers.

### III. CONCLUSION

We hold that the challenged portions of the 1982 interim final regulations are within the substantive authority of the EPA, and that the agency's exercise of that authority was not arbitrary and capricious. Inasmuch as the petitioners no longer seek relief for any procedural error that may have attended the promulgation of the regulations, the petitions for review are

*Denied.*